**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**BOWLING GREEN DIVISION**
**CRIMINAL ACTION NO. 1:16-CR-00022-GNS**

**UNITED STATES OF AMERICA**                                             **PLAINTIFF**

**V.**

**EDUARDO ROJAS CLARK**                                              **DEFENDANT**

**FINDINGS OF FACT, CONCLUSIONS OF LAW,**
**AND RECOMMENDATION**

BACKGROUND

Before the Court is the motion of Defendant Eduardo Rojas Clark to suppress evidence and for an evidentiary hearing (DN 31).  The United States opposed the motion, but agreed that the motion raised factual questions necessitating an evidentiary hearing (DN 32).  The motion is referred to the undersigned magistrate judge for hearing and preparation of this findings of fact, conclusions of law and recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Crim. P. 59(b)(1) (DN 33).  The evidentiary hearing was held on April 12, 2017 and the transcript of testimony is filed of record at DN 38.

Clark is charged under a single-count indictment with conspiracy to possess with intent to distribute more than 500 grams of methamphetamine under 21 U.S.C. § 841(a)(1), 841(b)(1)(A)(viii) and 846 (DN 11).  Clark was stopped for a traffic violation in Texas, and the investigating officer discovered narcotics hidden in a secret compartment in Clark's vehicle. Clark contends that the narcotics are the fruits of an illegal search of the vehicle.  He further

contends that statements he later made during questioning must be suppressed due to violation of his constitutional rights.

During the evidentiary hearing the United States called three law enforcement witnesses and introduced as evidentiary exhibits an audio-video recording of the traffic stop, photographs of Clark's car taken during the search and discovery of a hidden compartment, and a copy of the Texas state statue cited as the legal basis for the traffic stop.  The Defendant did not call any witnesses or offer any exhibits.


## FINDINGS OF FACT

On May 23, 2016 Texas State Trooper Robert Samuel Ben Dollar was conducting traffic patrol duties on Interstate 40 in Carson County Texas, approximately 25 miles east of Amarillo. He had completed a traffic stop of a vehicle and was walking back to his patrol car.  As he did so, he observed a black Acura vehicle in passing traffic which he believed failed to comply with TX TRANSP §545.157 (Hearing Ex. 2) which requires that, when traveling on a roadway with two lanes in the same direction, a vehicle passing an emergency vehicle operating its warning lights vacate the nearest lane or slow to a speed of 20 miles per hour below the posted speed limit, if that limit is 25 m.p.h. or more.  Trooper Dollar observed the Acura neither fully vacate the lane nor sufficiently reduce speed.  (DN 38, Hearing Transcript at p. 3, ln. 20-p. 7, ln. 11) (hereinafter "Tr.").

Trooper Dollar entered his patrol vehicle and followed the Acura for a short distance before effecting a traffic stop.  Defendant Clark was the driver and sole occupant of the vehicle. Trooper Dollar advised Clark that he was issuing a warning for failure to comply with the statute and asked for his identification.  Clark initially offered his credit card and then produced his license.  Trooper Dollar observed in the vehicle indications of "hard travel" in the form of fast

2

food packaging and open energy drinks strewn about the car.   When Clark retrieved his registration and insurance documentation from the glove box, Trooper Dollar observed that the glove box was otherwise empty.   He also observed that the car had new tires and bore an out-of-state license from California. (Tr. p. 7, ln. 19-p. 9, ln. 20).

Trooper Dollar testified that these factors cumulatively were an indicator of possible drug smuggling activity.   The trash in the car suggested extended travel without taking time to empty the car of trash.   The absence of any other items in the glove box was unusual, as routine use of a vehicle results in accumulation of everyday items.   New tires, Trooper Dollar testified, are common on vehicles with concealed compartments as a precaution against roadside breakdowns. California is a commonly known source of drugs transported through a corridor including that portion of Texas.   (Id.).

Trooper Dollar asked Clark to accompany him to his patrol vehicle while he conducted his checks and completed paperwork to issue the warning.   Trooper Dollar testified that he routinely has drivers wait with him in his patrol car.   Clark agreed and sat in the front passenger seat of Trooper Dollar's patrol car.   Trooper Dollar began processing the information via his in-vehicle computer terminal and began asking Clark basic questions about the ownership of the vehicle and his destination.   Clark told him the car belonged to his stepfather, but could not provide his stepfather's last name.   Clark said he was traveling to Kentucky to do roofing work with his stepfather, but could not identify the city to which he was traveling.   Trooper Dollar testified that, although he expects a degree of nervousness from anyone he stops, Clark demonstrated excessive nervousness.   Although the car was cool, Trooper Dollar observed Clark sweating.   He also noted that he belched and his breathing pattern seemed erratic. (Tr. p. 10, ln. 8-p. 13, ln. 9).

During the course of his standard records check Trooper Dollar observed an electronic notification that Federal Bureau of Investigation Special Agent Sean Laferte had "an interest" in the vehicle. Trooper Dollar testified an interest notice commonly indicates that a vehicle is suspected of involvement in smuggling narcotics. Trooper Dollar attempted to call S.A. Laferte but was unable to reach him. (Tr. p. 13, ln. 11-p. 14. Ln. 6).

Trooper Dollar's processing of the information for the warning citation lasted approximately six and one-half minutes. (Hearing Ex. 1, media file Camera 1.mp4 at 00:00-06:35). At that point he returned Clark's paperwork and had him sign the warning. He then asked Clark if he could ask him some additional questions and Clark agreed. Trooper Dollar asked if he had any weapons in the car, and Clark said he did not. Clark then voluntarily offered to allow Trooper Dollar to search the vehicle. Trooper Dollar followed up with questions about drugs in the vehicle or any compartments, to which Clark responded in the negative. (Id.). Even though Clark voluntarily offered to allow a search of the car, Trooper Dollar testified that he believed he had probable cause to conduct a search and would have called for a drug detection dog. "Due to my training and experience and the many cars I have talked about stopping over and over, I mean, you take the totality of the circumstances, all the criminal indicators we have talked about today, you put that all together, and this one is pretty well textbook what we see when we have a cross-country smuggler." (Tr. p. 16, ln. 25-p. 17, ln. 5).

Trooper Dollar asked Clark to exit the patrol car and stand in the grass area beside the road while he conducted the search. Trooper Trevor Dillard arrived on the scene to provide assistance, having overheard the traffic stop on the police radio. Trooper Dollar knelt down and inspected the Acura rear-underside. He observed that there were tool marks on the rear differential and muffler, indicating that the components had been "taken down." The Acura was

an all-wheel drive vehicle, with both front and rear axle differentials.  Trooper Dollar testified that he was familiar with such vehicles being modified to remove the gears from the rear differential to create a hidden compartment.  (Tr. p. 18, ln. 8-21). [1]

Because the Acura had low ground clearance, and specialty tools would be required to further investigate Trooper Dollar's suspicion, he asked Clark to drive the Acura and follow Trooper Dollar to a nearby law enforcement vehicle inspection facility approximately eight miles away.  Clark agreed.  Trooper Dollar also asked to take custody of Clark's cell phone for safety purposes, to which Clark also agreed.  (Tr. p. 19, ln. 7-p. 20., ln. 12).

Once at the inspection shop, Clark's vehicle was raised on a lift for examination of the drive-train.  Trooper Dollar felt the rear differential and noted that it was cool to the touch, which he believed was inconsistent with an operating gear assembly.  He removed the drain plug and observed inside the differential casing bundles of what appeared to be narcotics.  After disassembling the differential, Trooper Dollar confirmed his suspicion that the gears had been removed to create a hidden compartment and discovered 8 bundles of cellophane-wrapped narcotics which tested positive for crystal methamphetamine, weighing slightly over 5 pounds in total.  Clark was present in the shop during the search.  Upon discovering the narcotics, Trooper Dollar reported the find to Drug Enforcement Administration Special Agent Shane Reese. Thereafter, Trooper Dollar's involvement was limited to further searching the vehicle and processing the evidence.  He did not participate in any interviews.  (Tr. p. 20, ln. 13-p. 25, ln. 10).

S.A. Reese traveled to the inspection shop, arriving approximately thirty minutes after receiving Trooper Dollar's call.  In addition, Texas Department of Public Safety Agent Jason Lindley also responded to the report.  S.A. Reese advised Clark of his rights under Miranda then

---

[1] This modification essentially converts an all-wheel drive vehicle to a front-wheel drive vehicle.

asked him if he wished to talk to them.  Clark agreed.  Although the agents interviewed Clark, no one prepared an audio recording or a written report memorializing the conversation.  That interview lasted between 45 minutes and one hour.  As a result of the F.B.I. "interest" flag on the vehicle S.A. Reese contacted local F.B.I. Special Agent Scott Hendricks who came to the inspection shop.   In the meantime, S.A. Reese contacted F.B.I. Special Agent Laferte in Kentucky to arrange a controlled delivery of the narcotics.  Once the local F.B.I. agent arrived, S.A. Reese briefed him and then turned the investigation over to the F.B.I.  (Tr. p. 45, ln. 16-p. 51, ln. 11).

## CONCLUSIONS OF LAW

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. Amend. IV.  "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions."  Katz v. United States, 389 U.S. 347, 357 (1967).

Evidence obtained in violation of a defendant's constitutional rights bars the use of that evidence against him at trial.  Mapp v. Ohio, 367 U.S. 643 (1961).  A person who claims to have been aggrieved by an unlawful search or seizure bears the initial burden of production and persuasion to suppress evidence.  United States v. Smith, 783 F.2d 648, 650 (6th Cir. 1986).  The defendant must present a *prima facie* showing of a Fourth Amendment violation, i.e., that a government official, acting without a warrant, subjected him to either an arrest or a search and

6

seizure.  United States v. Bayless, 921 F. Supp. 211, 213 (S.D. N.Y. 1996) (citing cases), *aff'd*, 201 F.3d 116 (2d Cir. 2000).  Once the defendant has made a *prima facie* showing, the government then has the burden of demonstrating by a preponderance of the evidence that the search or seizure was not a constitutional violation. United States v. Bradley, 163 F. App'x 353, 357 (6th Cir. 2005).

   1.   Probable Cause for the Traffic Stop

      In the present case, there is no dispute that the search of Clark's vehicle was without the benefit of a warrant.  The Defendant therefore satisfies his initial burden.  Attention now turns to whether Trooper Dollar had probable cause to execute the traffic stop, the first link in the chain of events which lead to the search and evidentiary discovery.  United States v. Crumb, 287 F. App'x 511, 513 (6th Cir. 2008).  "An ordinary traffic stop by a police officer is a 'seizure' within the meaning of the Fourth Amendment.  Accordingly, any evidence seized during an illegal traffic stop must be suppressed as fruits of the poisonous tree."  United States v. Jackson, 682 F.3d 448, 453 (6th Cir. 2012).  However, a police officer may legally stop a car when he has probable cause to believe that a civil traffic violation has occurred.  United States v. Torres-Ramos, 536 F.3d 542, 550 (6th Cir. 2008).  Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion.  United States v. Jackson, 470 F.3d 299, 306 (6th Cir. 2006).

      As noted earlier, TX TRANSP §545.157 requires all motorists passing a vehicle with its emergency lights activated to vacate the nearest lane or slow to a speed at least twenty miles per hour below the posted limit.  There is no dispute that Trooper Dollar's vehicle's emergency lights were activated and Clark was therefore obligated to comply with the statute.  Trooper Dollar testified that he observed Clark pass without fully moving to the far lane.  The dash-camera video from Trooper Dollar's patrol vehicle confirms this testimony. (Hearing Ex. 1, media file Camera 2.mp4 at 00:55).  Trooper Dollar testified that he did not measure Clark's speed by radar, but, based upon his training and experience, believed that Clark had not sufficiently slowed in compliance with the statute.

On cross-examination, Clark's counsel questioned the accuracy of Trooper Dollar's speed estimation on two grounds. First, Clark's counsel pointed out that Trooper Dollar estimated Clark's speed as he was walking back to his cruiser without the benefit of any technology. The second challenge was that Trooper Dollar caught up with Clark within a short distance, notwithstanding that Clark had a "head start," and Trooper Dollar did not have to drive at a high rate of speed to do so.[2] However, the question is not how fast Clark was traveling when Trooper Dollar caught up to him; the question is how fast he was traveling when Trooper Dollar saw him pass by. In that regard, Trooper Dollar defended his speed estimate based upon his experience and as validated by required biannual certification which mandated a demonstration of the ability to identify vehicle speeds within five miles per hour faults (Tr. p. 31, ln. 15-19). While Clark has questioned the accuracy of Trooper Dollar's speed estimation, he has not presented evidence that refutes Trooper Dollar's opinion. Even if Trooper Dollar was mistaken as to Clark's speed, Clark has not demonstrated that the mistake was unreasonable or in bad faith. "When a probable-cause determination was based on reasonable but mistaken assumptions, the person subjected to a search or seizure has not necessarily been the victim of a constitutional violation. The very phrase 'probable cause' confirms that the Fourth Amendment does not demand all possible precision." Herring v. United States, 555 U.S. 135, 139 (2009). The undersigned concludes that Trooper Dollar had probable cause to believe that Clark had violated TX TRANSP §545.157 and to conduct the traffic stop.

2. Duration of the Traffic Stop and Initial Questioning

The next point of inquiry is whether the duration of the traffic stop and the questioning during the stop are constitutionally permissible. In Rodriguez v. United States, 135 S. Ct. 1609 (2015) the Supreme Court specified the measure by which to determine the permissible amount of time a suspect may be detained during a traffic violation investigatory stop. The permissible

---

[2] Trooper Dollar's dash-cam video shows that he caught up with Clark within less than one minute after pulling away from the roadside in pursuit. (Hearing Ex. 1, media file Camera2.mp4 at 01:05-01:50).

amount of time is tied to the "mission" of the stop, which focuses on traffic safety and includes both the issuance of a citation or warning and ordinary inquiries, such as checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.  Rodriguez, 1035 S. Ct. at 1614-16.  Here, the dash-cam recording demonstrates that, once Trooper Dollar and Clark were seated in the front seat of the police vehicle, Trooper Dollar began normal processing of information, including the use of his in-vehicle computer terminal and communicating by radio with dispatch.  At the conclusion of his investigation, he prepared a written warning and had Clark sign his copy.  Once Clark entered Trooper Dollar's patrol vehicle, the duration of this portion of the traffic stop entailed 6 minutes and 35 seconds (Hearing Ex. 1, media file Camera.1.mp4).  The undersigned concludes that the duration of the traffic stop was not unconstitutionally extended.

The fact that Trooper Dollar had Clark wait with him in the patrol car poses no constitutional problem.  Officers may require the driver to exit the vehicle during the traffic stop without violating the Fourth Amendment's proscription of unreasonable searches and seizures.  Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977).  This rule protects the safety of the officer while causing minimal intrusion on the driver, who has already been lawfully detained.  Id. at 111.  Directing a motorist to wait in a patrol car during the processing of a traffic stop does not constitute a custodial arrest for Fourth Amendment purposes unless it lasts beyond the time necessary to complete the purpose of the traffic stop or exceeds the purpose and objective of the stop.  United States v. Bradshaw, 102 F.3d 204, 211-212 (6th Cir. 1996).  Moreover, The Supreme Court has stressed that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."

Arizona v. Johnson, 555 U.S. 323, 333 (2009), *see also* United States v. Everett, 601 F.3d 484, 489-497 (6th Cir. 2010). These questions may include "general questions of who, what, where, and why" of the driver's travel, particularly when there are potentially suspicious circumstances involved. United States v. Ellis, 497 F.3d 606, 614 (6th Cir. 2007). In such instances, "questions about travel plans will 'rarely suggest a lack of diligence' by the officer because such questions 'may help explain or put into context, why the motorist was committing the suspicious behavior the officer observed.'" United States v. Jimenez, 446 Fed. App'x 771, 775 (6th Cir. 2011) (unpub.). In the present case, Trooper Dollar testified that he observed several factors associated with the Acura that suggested narcotics smuggling. Trooper Dollar's questions to Clark were routine and innocuous – who owned the car, where was he traveling, and what was the purpose of his trip? To Trooper Dollar's assessment, Clark demonstrated a suspicious inability to answer these simple questions. Trooper Dollar's questioning does not appear to have unreasonably extended the duration of the traffic stop or extend it to an extent that Clark would be considered to be in custodial detention and subject to advisement of his Miranda rights. *See* Everett, 601 F.3d at 489-497.

   3.   Duty to Provide *Miranda* Warning Before Questioning During Initial Traffic Stop

Given the non-coercive manner of inquiries, questioning during a routine traffic stop is not custodial in nature such that Miranda warnings are required even though the stop involves a brief period of detention. Berkemer v. McCarty, 468 U.S. 420, 434 (1984); United States v. Melcher, No. 16-1971, 2016 U.S. App. LEXIS 21589, at *7 (6th Cir. Dec. 2, 2016) (Unpub.). Consequently, Trooper Dollar was under no obligation to instruct Clark on his rights under Miranda prior to engaging in routine questioning while he processed the traffic stop.

4.  Post-Warning Citation Detention

At the conclusion of Trooper Dollar's processing of the traffic stop, he handed Clark his license and registration and a copy of the warning for his signature.  He advised Clark that it was only a warning, and no fines or penalties would be imposed.  Trooper Dollar asked Clark if he had everything, to which Clark responded in the affirmative.  At that point it is clear that Trooper Dollar had completed the "mission" of the traffic stop.

Immediately thereafter, the in-vehicle recording reflects the following exchange which took place during a time span of under one minute:

> Trooper Dollar: "Can I ask you a couple more questions?"
>
> Clark:  "Yeah."
>
> Trooper Dollar:  "You taking any medications?"
>
> Clark:  "No."
>
> Trooper Dollar:  "You on any medicines?"
>
> Clark:  "No."
>
> Trooper Dollar:  "Why you so nervous man?"
>
> Clark:  "Nervous?"
>
> Trooper Dollar:  "Yeah.  Your hand's shaking . . ."
>
> Clark:  "It's because . . ."
>
> Trooper Dollar:  "... your heart ..."
>
> Clark:  ". . . it's my first - it's my first - it's my first - I dunno."
>
> Trooper Dollar:  "It's cool in here.  You're starting to get shiny where you're sweating.  You good?"
>
> Clark:  "I actually have to rest."
>
> Trooper Dollar:  "You need to rest.  Okay."

Clark:  "Yeah."

Trooper Dollar:  "Hey, is there anything illegal in the car making you nervous?"

Clark:  "No."

Trooper Dollar:  "No weapons?"

Clark:  "No.  You can - you can check it."

Trooper Dollar:  "I can check it?"

Clark:  "Yeah."

Trooper Dollar:  "No knives, no pistols?"

Clark:  "No, go ahead."

Trooper Dollar:  "Marijuana?"

Clark:  "No.  No."

Dollar:  "Coke, meth?"

Clark:  (Shaking head no.)

Trooper Dollar:  "Is there any compartments in the vehicle?"

Clark:  (Shaking head no.)

Trooper Dollar:  "*Clavos*?  *Compartimientos*?"[3]

Clark:  (Shaking head no and shrugging shoulders.)

Trooper Dollar:  "You sure?"

Clark:  (Shrugging shoulders).

Trooper Dollar:  "Hey, look at me.  Are you sure?"

Clark:  "Yeah."

Trooper Dollar:  "There's none in there?"

---

[3] *Compartimientos* means compartments in Spanish.  *Clavos* is slang in Spanish for compartments (Tr. p. 41, ln. 13-p. 42, ln. 4).

> Clark:  "No."
>
> Trooper Dollar:  "Can I search the vehicle?
>
> Clark:  "Yeah, sure."

(Hearing Ex. 1, media file Camera 1.mp4 at 6:36-7:17).

At that point, Trooper Dollar instructed Clark to exit the patrol vehicle and stand aside while he conducted a roadside examination of Clark's vehicle, during which Trooper Dollar observed what he described as suspicious tool marks on the vehicle's rear transfer case and muffler.  He believed this suggested that the vehicle had been partially disassembled to create a hidden compartment for smuggling.

Even though Trooper Dollar returned Clark's personal documents, provided him a copy of the warning, and told him no fine or penalty was assessed, he did not tell Clark that he was free to exit the patrol car before inquiring if Trooper Dollar could ask additional questions, even though, as noted, the "mission" of the traffic stop was completed.  Although an officer may not expressly forbid a person from leaving, detention occurs when the totality of circumstances convey to a reasonable person that he is not free to leave.  United States v. Williams, 615 F.3d 657, 665 (6th Cir. 2010).  Moreover, Trooper Dollar testified that, by that point in the encounter, his suspicion was sufficiently elevated such that he intended to call for a drug detection dog if Clark did not give permission to search and would have detained Clark for that purpose (Tr. p. 36, ln. 6-12).

Once a traffic stop comes to a logical conclusion, additional questioning constitutes a new, independent seizure requiring reasonable suspicion.  Absent such suspicion, even the briefest further detention violates the Fourth Amendment.  Everett, 601 F.3d at 492, fn. 9 (citing United States v. Urrieta, 520 F.3d 569, 578-79 (6th Cir. 2008)).  Trooper Dollar would only have

13

been justified in detaining Clark for further questioning beyond the time required to complete the initial traffic stop if something happened during the stop which gave rise to a reasonable and articulable suspicion of additional criminal activity. United States v. Davis, 430 F.3d 345, 353 (6th Cir. 2005). In United States v. Hall this Court explained the standard of "reasonable and articulable suspicion" in the following manner:

> While "articulable suspicion" is not a particularly clear standard, it has been said that "the totality of the circumstances-the whole picture-must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."

No. 1:06CR-62-R, 2008 WL 57083, at *3 (W.D. Ky. Jan. 3, 2008) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). "'Reasonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person . . . of criminal activity.'" United States v. Richardson, 385 F.3d 625, 630 (6th Cir. 2004) (quoting Cortez, 449 U.S. at 417-18)).

Trooper Dollar testified that his suspicion was initially piqued by the fact that litter in the car interior suggested "hard driving." He further noted that the car glove box lacked any of the miscellaneous contents which normally accumulate with routine use of a car. He also observed that the car bore new tires and out of state tags. The stop took place on Interstate 40 in Carson County, which Trooper Dollar testified was a known drug corridor. Trooper Dollar testified that his initial observations were consistent with a vehicle used for drug smuggling. While none of these would, even in the cumulative, give rise to probable cause for further detention, they did form the seed in light of Trooper Dollar's experience.

Trooper Dollar's initial questioning of Clark caused the seed of suspicion to grow. Clark advised that his step-father was the registered owner of the car, but could not recall his last

14

name.[4]   He stated he was heading to Kentucky to do roofing work, but could not identify his

destination in Kentucky.[5]   Clark said that his step-father had arranged the job, and that he would

call him for the address "when I'm close."[6]   Trooper Dollar testified that Clark seemed unusually

nervous[7] and was demonstrating signs of anxiety such as sweating, erratic breathing, and

belching.   Finally, the records check revealed an interest by the F.B.I. in the vehicle.   All of this,

Trooper Dollar testified, culminated in what he considered "textbook" indicators of possible drug

smuggling.

In evaluating the totality of the circumstances presented to the investigating officer, law-

enforcement officials are "permitted to draw on their own experience and specialized training to

make inferences from and deductions about the cumulative information available to them that

might well elude an untrained person."   United States v. Shank, 543 F.3d 309, 315 (6th Cir.

2008).   At the time of the search, Trooper Dollar had approximately ten years' experience with

the Texas Department of Public Safety as a law enforcement officer.   He testified that he both

received and provided training in drug interdiction, including providing training for private

companies, both within the United States and internationally, and had been a member of the state

criminal interdiction team (Tr. p. 4, ln. 18-24).   The undersigned concludes that Trooper Dollar

---

[4] Clark was driving a car he did not own and could not identify the owner by last name.  This is analogous to situations in which an individual driving a rental car for which he was not listed as a driver was a factor in the probable cause evaluation. *See* United States v. Winters, 782 F.3d 289, 299-300 (6th Cir. 2015); United States v. Suarez, Nos. 94-5134/94-5143,1995 U.S. App. LEXIS 1657, at *4-5 (6th Cir. Jan. 25, 1995) (Unpub.).

[5] Inability to identify a destination is afforded weight in the probable cause evaluation. *See* United States v. Villa, 589 F.3d 1334, 1340 (10th Cir. 2009); United States v. Henry, 372 F.3d 714, 715 (5th Cir. 2004).

[6] Questionable explanations of travel plans are afforded weight in the probable cause evaluation.  *See* Winters 782 F.3d at 299.

[7] The undersigned recognizes that nervousness is to be expected in a law-enforcement encounter and is generally considered an unreliable basis for reasonable suspicion and is therefore accorded little weight in the totality of the circumstances evaluation. *See* Winters 782 F.3d at 299.  Consequently, Clark's nervousness has not been given significant weight in the evaluation, notwithstanding that Trooper Dollar testified that Clark's nervousness appeared greater than normal under the circumstance.

had an articulable suspicion that Clark was engaged in narcotics smuggling and had probable

cause to further detain Clark for additional questioning, particularly in light of the fact that the

additional questioning lasted less than one minute.

5. Duty to Provide *Miranda* Warning Before Post-Warning Citation Questioning

As noted earlier, Clark's initial detention during the traffic stop investigation was not of a

custodial nature which implicated a duty to advise him of his Miranda rights.  Consequently, the

next question is whether, following the conclusion of the business of the traffic stop, Clark was

entitled to a Miranda warning before the additional questioning commenced.

> Police must give Miranda warnings only if a suspect is "in
> custody."  A suspect is in custody if police have either arrested him
> or restricted his freedom of movement as though he were under
> arrest.   The test for custody is objective; courts ask how a
> "reasonable person in the [suspect's] position" would "gauge the
> breadth of his . . . freedom of action."   To answer that question,
> courts look to "all of the circumstances" surrounding the interview,
> paying special mind to the following four factors: where the
> interview was conducted; the duration and manner of the officer's
> questioning; whether the officers restrained the suspect's
> movement; and whether they told him he could refuse to be
> interviewed.

United States v. Melcher, No. 16-1971, 2016 U.S. App LEXIS 21589 at *6 (6th Cir. Dec. 2,

2016) (Citations omitted).

"If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to

treatment that renders him 'in custody' for practical purposes, he will be entitled to the full

panoply of protections prescribed by Miranda."   Berkemer v. McCarty, 468 U.S. 420, 440

(1984).  However, there is no bright line by which to determine when the non-custodial detention

associated with a traffic stop evolves into custodial detention subject to Miranda.  "Admittedly,

our adherence to the doctrine just recounted will mean that police and lower courts will continue

16

occasionally to have difficulty deciding exactly when a suspect has been taken into custody." Id. at 441.

In the present case, Trooper Dollar initially instructed Clark to sit in the front seat of the cruiser.  When Trooper Dollar concluded the processing of the warning citation, had Clark sign it, and returned his personal documents, the "mission" of the traffic stop was concluded.  Trooper Dollar did not, however, explicitly tell Clark he was "free to go" or otherwise released from the instruction to sit in the patrol car.  Instead, Trooper Dollar immediately asked Clark if he could ask "a couple more questions."  There was thus no indication to Clark that the traffic stop was concluded and he could choose to exit the vehicle if he wished.  Trooper Dollar posed the question in a conversational tone with no coercive implications; however, he did not indicate that Clark was not under any obligation to speak with him further.  The ensuing questioning was likewise conversational and brief.   All-in-all, this would pose a close question for whether the post-warning citation detention for purposes of further questioning rose to the level of custodial detention.  Trooper Dollar resolves the issue, however, through his testimony that Clark was not free to leave at that time.

> A.     At that point in time I believe – I knew 100 percent I had reasonable suspicion.  I believed he was smuggling narcotics cross-country.  If he – at that point in time the question was if he refused consent, what would I have done.  I would have called a K-9 officer at that point.
>
> Q.  Okay.  Was he free to leave at that point?
>
> A.  At this point, no, he's not leaving.
>
> Q.  Okay.  Because if you had called a K-9 officer and he drove off – I mean, you would have to hold him?
>
> A.  Absolutely.

17

Q.  So at least at this point in time he's not free to leave?

A.  No, sir.

(Tr. p. 36, ln. 1-17).

Given that the questioning took place while Clark was under custodial detention and without the benefit of a <u>Miranda</u> warning, Clark's post-warning citation statements made in the patrol vehicle must be suppressed.

6.  <u>Consent to Search</u>

"The Fourth Amendment provides that individuals shall be free from warrantless unreasonable searches and seizures in their 'persons, houses, papers, and effects.'" <u>Hardesty v. Hamburg Twp.</u>, 461 F.3d 646, 651 (6th Cir. 2006) (quoting U.S. Const. Amend. IV). "It is well-settled that a person may waive his Fourth Amendment rights by consenting to a search. . . . Consent to a search may be in the form of words, gesture, or conduct. . . .  In whatever form, consent only has effect if it is freely and voluntarily given." <u>United States v. Carter</u>, 378 F.3d 584, 587 (6th Cir. 2004) (internal quotations and citations omitted).  "It is the Government's burden, by a preponderance of evidence, to show through 'clear and positive' testimony that valid consent was obtained." <u>United States v. Hinojosa</u>, 606 F.3d 875, 881 (6th Cir. 2010) (<i>quoting</i> <u>United States v. Burns</u>, 298 F.3d 523, 541 (6th Cir. 2002)).  The determination of whether consent is freely and voluntarily given is made in light of the totality of the circumstances involved.  <u>Id.</u>  Moreover, voluntary and knowing consent does not require that the defendant be advised that he is entitled to refuse consent. <u>United States v. Bradley</u>, 163 F. App'x. 353, 357 (6th Cir. 2005) (Unpub.) (<i>citing</i> <u>United States v. Drayton</u>, 536 U.S. 194, 206 (2002)).

The video recorded in the patrol vehicle clearly demonstrates that Clark gave Trooper Dollar permission to search the vehicle.  As noted earlier, it is the totality of the circumstances

which must be considered in determining if consent is given voluntarily, and, if some detention is involved, the analysis includes the length and nature of the detention; the use of coercive or punishing conduct by the police and indications of "more subtle forms of coercion that might flaw an individual's judgment." United States v. Ivy, 165 F.3d 397, 402 (6th Cir. 1998) (*citing* Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) and United States v. Watson, 423 U.S. 411, 424 (1976)).

After Trooper Dollar completed the business of the traffic stop, he asked Clark if he could ask "a couple more questions" to which Clark readily agreed. The interaction lasted less than one minute. Neither Trooper Dollar's questions nor demeanor were intimidating. No threats of any kind were made. Clark twice volunteered to allow Trooper Dollar to search the car as an apparent means of alleviating Trooper Dollar's obvious suspicions,[8] and agreed a third time when Trooper Dollar expressly asked for permission. The undersigned concludes that Clark's permission to search the car was free and voluntary.

The fact that Clark had not been advised of his Miranda rights at the time he gave consent does not invalidate the free and voluntary nature of his consent. "[T]he fact of custody alone has never been enough to demonstrate a coerced . . . consent to search." United States v. Watson, 423 U.S. 411, 424 (1976). It is the totality of the circumstances test, and not the fact of detention, which controls the determination of whether consent is free and voluntary. United States v. Salvo, 133 F.3d 943, 953-54 (6th Cir. 1998). As noted, there is no indication that Trooper Dollar exerted any coercion over Clark to extract permission to search the vehicle.

---

[8] *See, e.g.* United States v. Tragash, 691 F. Supp. 1066, 1072 (S.D. Ohio 1988) ("It is clear that neither coercion nor duress prompted defendant to consent in this case. It was defendant's desire to appear to be cooperative in hope that [the investigating law enforcement officer] would lose interest, make a non-thorough search, or even perhaps be called away by another more pressing assignment. If he pretended he had nothing to conceal, it would be reasonable to hope that the drugs might not be found.").

7. <u>Suppression of Statements Made at the Vehicle Inspection Facility</u>

At Trooper Dollar's request, Clark drove the vehicle to a nearby vehicle inspection facility.  It was there that Trooper Dollar discovered the narcotics hidden in the rear differential compartment.   Trooper Dollar did not further question Clark, rather S.A. Reese arrived and handled questioning.   S.A. Reese testified that he carried a card with the <u>Miranda</u> warning printed on it, and he read it to Clark (Tr. p. 47, ln. 11-17).  The advisement concluded with the question "do you understand?"   (Tr. p. 48, ln. 8).   S.A. Reese testified that Clark gave an affirmative indication of his understanding:

> Q.  Okay.  Now, you read the <u>Miranda</u> warnings which were on that card, which we have heard.  At the end of it – is that on the card, "Do you understand," or is that a question you asked, "Do you understand?"
>
> A.  It's on there, "Do you understand?"
>
> Q.  And did you ask that after each warning, or did you ask that at the end of reading the card?
>
> A.  At the end.
>
> Q.  Okay.  And what was Mr. Clark's response?
>
> A.  He just said, "Yes, I understand."  A lot of times I'll follow that up, "Do you want to talk to us?"  Make it a little more plain.  "Do you understand?"  "Yes."  "Do you want to talk to us?"  "Yes."
>
> Q.  What did you do in this case?
>
> A.  That's standard for me, that right there.  "Do you understand?"  Wait for them to answer.  "Yes."  "Do you want to talk to us?"  "Yes."  That's what happened in this case.
>
> Q.  That's what happened in this case?
>
> A.  Yes.

(Tr. p. 54, ln. 2-20).

20

Agent Lindley was present during S.A. Reese's reading of the <u>Miranda</u> warning and had a different recollection. While he recalled S.A. Reese reading the warning, he did not recall any affirmative response from Clark as to his understanding or willingness to talk:

> Q.  Okay.  After Special Agent Reese Mirandized or read the card of rights, did Mr. Clark make any response or have any response to that?
>
> A.  No, not that I recall, sir.
>
> Q.  Okay. So he read the warnings off the card?
>
> A.  Yes, sir.
>
> Q.  And he was, I assume, close to Mr. Clark, across the table or next to him"
>
> A.  Yes, sir.
>
> Q.  And did Mr. Clark make any acknowledgement, or did he say anything, or did he just launch into his statement after these warnings were read?
>
> A.  Special Agent Reese started asking questions, and then he responded to the questions.

(Tr. p. 62, ln. 24-p. 63, ln. 12).

Clark argues that any statements he made subsequent to S.A. Reese's reading of the <u>Miranda</u> rights should be suppressed because the advisement was deficient.  First, Clark notes the discrepancy between S.A. Reese's testimony and Agent Lindley's testimony about whether Clark expressed understanding of his rights after hearing the <u>Miranda</u> warning.  Further, Clark contends that an expression of understanding is insufficient and a suspect must affirmatively waive those rights before any questioning is allowed.

A suspect may waive his <u>Miranda</u> rights "provided the waiver is made voluntarily, knowingly and intelligently."  <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).  While <u>Miranda</u>

imposes a rule on police "that is both formalistic and practical when it prevents them from interrogating suspects without first providing them with a <u>Miranda</u> warning, it does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights." <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 385 (2010).  Where a suspect, with full understanding of the rights, acts in a manner inconsistent with the exercise of the rights, the court may presume a deliberate choice was made to waive those rights.  <u>Id.</u>  "[A] <u>Miranda</u> 'waiver may be clearly inferred . . . when a defendant, after being properly informed of his rights and indicating that he understands them, nevertheless does nothing to invoke those rights and speaks.'"  <u>United States v. Adams</u>, 583 F.3d 457, 467 (6th Cir. 2009) (*quoting* <u>United States v. Nichols</u>, 512 F.3d 789, 798-99 (6th Cir. 2008)).

Here, both S.A. Reese and Agent Lindley were confident that S.A. Reese read Clark a full <u>Miranda</u> warning.  While Agent Lindley did not recall S.A. Reese asking Clark if he understood the warnings, S.A. Reece was confident that he did.  This discrepancy is an insufficient basis upon which to conclude that S.A. Reece's recollection was faulty or that his testimony was untrue.  While neither witness testified that Clark expressly stated that he waived his rights under <u>Miranda</u>, his cooperation and agreement to answer questions provides support for a presumption that, having been informed of his rights, he made a deliberate choice to waive those rights.  Consequently, statements Clark made after being advised of his <u>Miranda</u> rights are not subject to suppression.

<u>RECOMMENDATION</u>

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant Clark's motion to suppress (DN 31) be **GRANTED** in part and **DENIED** in part.  Any statements Clark made between the time when Trooper Dollar issued the warning citation and when he received the <u>Miranda</u> warning at the vehicle inspection facility should be suppressed.  Clark's motion should be denied in all other respects.

<u>NOTICE</u>

Therefore, under the provisions of 28 U.S.C. § 636(b)(1)(B) and Fed. R. Crim. P. 59(b)(1), the Magistrate Judge files these findings and recommendations with the Court and a copy shall forthwith be electronically transmitted or mailed to all parties.  Within fourteen (14) days after being served with a copy, any party may serve and file written objections to such findings and recommendations as provided by the Court.  Fed. R. Crim. P. 59(b)(2).  "Failure to object in accordance with this rule waives a party's right to review."  Fed. R. Crim. P. 59(b)(2).

Copies:          Counsel